J-A19016-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.B.M.Y., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF M.Y., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 727 EDA 2017 |

Appeal from the Order Entered January 25, 2017
In the Court of Common Pleas of Monroe County
Domestic Relations at No(s):  12 O.C.A. 2016

BEFORE: BENDER, P.J.E., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.:             **FILED SEPTEMBER 06, 2017**

Appellant, M.Y. ("Mother"), appeals from the Order involuntarily terminating her parental rights to H.B.M.Y. ("Child") pursuant to the Adoption Act, 23 Pa.C.S. §§ 2511(a) and (b).  After careful review, we affirm.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

Child was born in Nyack, New York, in June 2013.  Three weeks after Child's birth, Mother and Father[1] voluntarily placed Child in the care of his paternal grandmother, D.Y., and his paternal step-grandfather, J.B.V. (collectively, "the Grandparents"), who reside in Monroe County,

---

[1] On April 19, 2016, the orphans' court entered a Decree terminating Father's parental rights to Child.  Father did not appeal.

Pennsylvania. Child has remained in the care of the Grandparents since that time.

On November 3, 2013, the Grandparents filed an emergency Custody Complaint and on February 20, 2014, the court granted the Grandparents sole legal and physical custody of Child.

In January 2014, Mother was arrested and charged with Burglary in New York. She was subsequently convicted and received a sentence of four and a half years' incarceration.

On March 11, 2016, the Grandparents filed a Petition to Terminate Mother's Parental Rights to Child ("TPR Petition"). On April 18, 2016, the orphans' court held a hearing on the TPR Petition, but did not appoint counsel for Mother or advise Mother that she could request court-appointed counsel. Mother did not participate in the hearing. On April 22, 2015, the orphans' court entered a Decree involuntarily terminating Mother's parental rights to Child.

On May 18, 2016, Mother timely filed a *pro se* Notice of Appeal averring, *inter alia*, that the orphans' court erred when it failed to notify her of her right to be represented by counsel during the TPR hearing.[2] On

_____

[2] Mother also attached a letter to the Notice of Appeal, which averred that she was unable to afford counsel, and asked the orphans' court to appoint counsel for her on appeal. The orphans' court entered an order on May 20, 2016, granting Mother *in forma pauperis* status, but denying her request for counsel, because "no such right exists in this type of appeal." Order, 5/20/2016. On June 7, 2016, this Court entered a *per curiam* Order
*(Footnote Continued Next Page)*

November 7, 2016, this Court: (1) vacated the portion of the April 22, 2015 Decree terminating Mother's parental rights; (2) remanded the matter to the orphans' court for a new termination hearing; and (3) instructed the orphans' court to advise Mother of her counsel rights, appoint counsel for Mother, or affirmatively determine that Mother does not qualify for counsel. *See In re Adoption of H.B.M.Y.*, No. 1543 EDA 2016, unpublished memorandum at 3 (Pa. Super. filed November 7, 2016).

On January 20, 2017, the orphans' court held a second hearing on the TPR Petition where counsel represented Mother. At the hearing, the Grandparents presented testimony that they have cared for Child since June 2013 when they received a call from Mother and Father asking the Grandparents to come pick up the three-week-old Child and care for him because the parents were having financial difficulties. The Grandparents presented evidence that approximately seven months later, Mother began a four-and-a-half year sentence for Burglary in New York. During the seven months prior to her incarceration, Mother did not have any face-to-face contact with Child.

The Grandparents presented testimony that Mother became pregnant shortly before her incarceration and gave birth to S.Y. while in prison. The

*(Footnote Continued)* ───────────

directing the orphans' court to determine whether Mother qualifies for court-appointed counsel and, if so, to appoint counsel for Mother. The orphans' court appointed appellate counsel for Mother on June 9, 2016.

- 3 -

prison allowed S.Y. to remain with Mother until S.Y. was a year old, when the Grandparents began to care for her. The only visit that Mother has ever had with Child was in June 2015 when the Grandparents went to the prison to pick up S.Y. and Child accompanied them.[3] The Grandparents cared for S.Y. from approximately June 2015 to September 2016; S.Y. reunited with Mother in September 2016 after Mother's release from prison to a halfway house in New York with a mother/child program.

Grandmother testified that during Mother's incarceration, Mother would occasionally call to speak with Child on the telephone, mostly on holidays. In addition, Mother would send Child pictures that she had colored from a coloring book on holidays and his birthday. In January 2016, a few months prior to the filing of the TPR petition, Mother began calling a few times a week to speak with Child. The Grandparents presented testimony that Mother has not provided any financial support for the child.

The Grandparents both testified that they were ready, willing, and able to adopt Child. Specifically, when counsel asked Grandmother to describe Child, she answered: "He is our world. He is like our son. We take care of him. We do whatever needs to be done, take him to the doctor, when he's sick we're there. We feed him. We play with him. He is like our son." N.T.

---

[3] The Grandparents brought Child and S.Y. to the prison one additional time, but Child stayed in the car because Child was asleep.

TPR Hearing, 1/20/17, at 11-12. Child calls the Grandparents "mommy" and "daddy."

Mother testified on her own behalf. She stated that she had asked the Grandparents to care for Child when Child was three weeks old because she did not have stable housing and was unemployed. Mother admitted that she did not have any face-to-face contact with Child in the seven months prior to her incarceration, but testified that she called the Grandparents a couple of times a week during that time. Mother further testified that during her incarceration she attempted to call Child several times a week and sent cards to Child on birthdays and holidays. Mother submitted a phone log showing that she had attempted to call Child several times a week between January 2016 and March 2016. *See* Mother's Exhibit A, Prison Phone Log.

Mother also stated that, while she was incarcerated, she had asked for a visit with Child, but the Paternal Grandmother denied the request because "the car wasn't in good condition for long distance." N.T. TPR Hearing, 1/20/17, at 33-34. Mother testified that the Grandparents lived two to three hours away from the prison in New York. She also stated that the parenting center at the prison would have reimbursed the Grandparents for travel expenses. When asked if she had informed the Grandparents about the potential reimbursement, Mother testified: "I don't remember. If I did not, it's because I knew she wasn't going to come." *Id.* at 34. Mother also testified that she attended parenting classes in prison.

Mother submitted evidence that in September 2016 she had been released from prison to a halfway house in New York State where she currently lives with S.Y. She participates in a work release program and a thrift shop employs her as a cashier. Mother testified that she expects to be released from the halfway house in November 2017 and that she had spoken to the Grandparents about reunifying with Child. Mother recalled, "I remember one conversation I had with [Grandmother] about my plans upon release, and that I would like to have a relationship with him, that I would like to get him to know me as his mother." N.T. TPR Hearing, 1/20/17, at 37. Mother further stated that when she is released from the halfway house, she is hoping to get visitation with Child because "he needs to get to know me first." *Id.* at 38.

On January 25, 2017, the orphans' court entered a Decree involuntarily terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). Mother timely appealed. Both Mother and the orphans' court complied with Pa.R.A.P. 1925.

**ISSUES ON APPEAL**

Mother raises the following issues on appeal:

1. Are the orphans' court findings of fact supported by the record?

2. Did the orphans' court err in finding that [Grandparents] established by clear and convincing evidence that involuntary termination of Mother's parental rights best serves the needs and welfare of the child where the orphans' court relied on findings of facts that are contrary to the record?

> 3. Did Mother offer sufficient evidence to prove that she took affirmative steps to utilize the resources available to her while incarcerated to maintain a relationship with the minor child?

Mother's Brief at 4.

**LEGAL ANALYSIS**

When we review a trial court's decision to terminate parental rights, "we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation and quotation omitted). We may reverse a decision based on an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation and quotation omitted). We may not reverse, however, "merely because the record would support a different result." *Id.* (citation omitted).

We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation and quotation omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental

rights are valid. ***In re R.N.J.***, ***supra*** at 276. We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (quotation and citation omitted).

**Termination Pursuant to Section 2511(a)**

Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of the TPR hearing is on the conduct of the parent and whether that conduct justifies a termination of parental rights. ***In re B.L.L.***, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, "the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." ***In re K.Z.S.***, 946 A.2d 753, 758 (Pa. Super. 2008) (citation and quotation omitted). Rather, "[t]he court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." ***Id.*** (citation and quotation omitted).

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations and internal paragraph breaks omitted).

Moreover, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted). And most importantly, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while

others provide the child with his or her physical and emotional needs." **Id.** (citation omitted).

We recognize that "incarceration of a parent does not, in itself, provide sufficient grounds for termination of parental rights; however, an incarcerated parent's responsibilities are not tolled during [her] incarceration." **In re C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted). An incarcerated parent is expected to take affirmative steps to support a parent-child relationship and "utilize whatever resources are available to [her] while in prison in order to foster a continuing close relationship with [her] children." **In re E.A.P.**, 944 A.2d 79, 83 (Pa. Super. 2008).

Our review of the record supports the orphans' court's determination that, because Mother has refused or failed to perform parental duties for more than six months prior to the filing of the petition in order to preserve the parent-child relationship, the Grandparents had met their burden under 23 Pa.C.S. § 2511(a)(1). Mother has neither cared for nor provided financial support for Child since he was three weeks old. After leaving the then-three-week-old Child with the Grandparents, Mother did not visit or attend pediatric appointments with Child. Seven months later, Mother was sentenced to prison in New York from where she initiated phone calls with, and sent coloring-book pictures to, Child only on holidays and birthdays. In

the two months preceding the filing of the TPR Petition, however, Mother increased the phone calls to several times a week.

Most notably, Mother has had only one visit with Child since June 2013. While incarcerated, Mother did not take affirmative steps within her control to obtain visitation with Child: she did not seek to modify the existing custody order to provide her with visitation; she did not make repeated requests to see Child; and she did not arrange for the parenting center at the prison to reimburse the Grandparents for travel expenses to facilitate visitation.

In light of the evidence, the trial court properly concluded that Mother failed to take affirmative steps to support a parent-child relationship and failed to utilize every resource available to her in prison to facilitate visitation and maintain a parent-child relationship. *See In re E.A.P.*, *supra* at 83. Accordingly, the trial court properly exercised its discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1).

Mother avers that the trial court made erroneous findings of fact and, as a result, the court's determination is not supported by sufficient evidence. Our review of the record reveals that the record does not support the following two findings: (1) "Mother sent no cards, letters or gifts to [Child];" and (2) "There was no testimony that Mother took parenting classes or other self-improvement classes while incarcerated." Trial Ct. Op., filed 1/25/17, at 7, 8.

The trial court made a finding that Mother did not send any cards, letters, or gifts to Child, but the testimony from both Grandmother and Mother reveals otherwise. Grandmother testified as follows:

> [Attorney]: Does [Mother] send gifts?
>
> [Grandmother]: I believe I should be receiving gifts – Christmas gifts soon. I have not received them yet though.
>
> [Attorney]: You haven't received any gifts for [Child]?
>
> [Grandmother]: No
>
> [Attorney]: From [Mother] in particular?
>
> [Grandmother]: That's correct.
>
>                * * *
>
> [Attorney]: Okay. You said that there were times that she sent cards and gifts. Was it for both children?
>
> [Grandmother]: What do you mean? For [Child] and [S.Y.]?
>
> [Attorney]: Yes.
>
> [Grandmother]: Yes.
>
> [Attorney]: Okay. And did she do that through the program at the jail where they allow Mother's to send?
>
> [Grandmother]: Yes. She would draw, like, in the coloring book or however she would do them and send them, yes.
>
> [Attorney]: Okay. And that was basically the holidays and his birthday?

**[Grandmother]:**     Yes.

**[Attorney]:**     Okay.   Do you recall if there were any other times that she sent letters or anything like that to him?

**[Grandmother]:**     Not to my knowledge.

N.T. TPR Hearing, 1/20/17, at 10, 18.   Mother also testified that she sent cards to Child on holidays and birthdays.   **See id.** at 44.

We are mindful that the orphans' court is free to believe all, part, or none of the evidence presented, and to make credibility determinations and resolve conflicts in the evidence.   In this instance, in light of the Grandmother's and Mother's corroborating testimony, we conclude that the orphans' court erred in finding that Mother had sent **no** cards, gifts, or letters to Child.

The trial court's second erroneous finding of fact was that "[t]here was no testimony that Mother took parenting classes or other self-improvement classes while incarcerated."   Trial Ct. Op., filed 1/25/17, at 8.   In fact, Mother testified: "[w]hen I was in Bedford, I took parenting classes.   Here in the nursery, there is a class that I take.   And at the parenting center, they offered several classes, which I signed up, and I'll take those classes."   N.T. TPR Hearing, 1/20/17, at 41-42.   Accordingly, the orphans' court erred in finding that there was **no** testimony that Mother took parenting classes in prison.

Notwithstanding the trial court's errors with respect to those two findings of fact, as discussed above, there was sufficient evidence presented during the TPR hearing to support the trial court's remaining findings of fact and its termination of Mother's parental rights under 23 Pa.C.S. § 2511(a)(1). We, thus, conclude the court's errors to be harmless. **See In re Adoption of C.D.R.**, 111 A.3d 1212, 1216 n.3 (Pa. Super. 2015) (concluding that any error by orphans' court in adopting factual findings from juvenile court's permanency review order would not require reversal of the order terminating mother's parental rights, as ample evidence presented during termination hearing supported orphans' court decision).

**Termination Pursuant to Section 2511(b)**

We agree with the orphans' court's determination that the Grandparents met their burden under 23 Pa.C.S. § 2511(b), and that terminating Mother's parental rights is in the best interest of Child.

With respect to Section 2511(b), our analysis shifts focus from parental actions in fulfilling parental duties to the effect that terminating the parental bond will have on the child. Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super.

- 14 -

2005) (citation omitted). This Court has emphasized that although a parent's emotional bond with her child is a "major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted). Finally, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, *supra* at 762–63.

The trial court opined:

> [Child]'s needs and welfare would be best met by termination of Mother's parental rights. [Child] has lived his entire life, with the exception of his first three weeks, with Grandparents. [Child] is now 3 ½ years old. [Child] is bonded with [] Grandparents and identifies them as his parents. [Child] does not identify Mother as his mother, despite [] Grandparents' attempts to explain the situation to the minor child.

> * * *

> [Child] is currently in stable housing with Grandparents who provide for all of his needs. . . . [Child] is at an age where he is able to identify those who have provided daily nurturing, love and support, and clearly knows Grandparents as his parents. To reintroduce Mother at this stage of [Child]'s life, after only knowing Grandparents as caretakers with a seemingly lengthy period ahead before Mother is in stable housing, is not in [Child]'s best interests. The stable home and long[-]existing relationship of Grandparents, who will seek the permanency of adoption, would serve the best interests of [Child]. Reunification with Mother, who has had minimal contact, and no direct involvement in nurturing and raising [Child], would not be in [Child]'s best interest.

Trial Ct. Op., filed 1/27/17, at 8-9. Our review of the record supports the trial court's conclusions.

**CONCLUSION**

In sum, our review of the record reveals that the Grandparents provided clear and convincing evidence to support the termination of Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/6/2017